Joel O'D. Cornish and Marcella G. Cornish, Husband and Wife v. Commissioner.
Cornish v. Commissioner
Docket No. 53826.
United States Tax Court
T.C. Memo 1957-61; 1957 Tax Ct. Memo LEXIS 199; 16 T.C.M. (CCH) 267; T.C.M. (RIA) 57061; March 29, 1957
*199 Petitioner, the owner of a one-third interest in Tract I, obtained partly by inheritance, formed a plan of disposing of the tract by platting the area into lots. Thereafter he bought another one-third interest in Tract I and a one-half interest in Tracts II and III, contending the latter purchases were necessary in order to bring utilities to Tract I. In 1951 he sold two lots in Tracts II and III. Held, the profit from the sales was ordinary income. Raymond E. McGrath, Esq., First National Bank Building, Omaha, Neb., for the petitioners. William E. McCormick, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion The respondent determined a deficiency in income tax against the petitioners for the taxable year 1951 in the amount of $1,623.37. The sole issue in this case is whether gains realized from the sale of two lots in which the petitioners had an interest should be taxed as long-term capital gains or as ordinary income. Findings of Fact Some of the facts have been stipulated and they are found accordingly. Joel O'D. Cornish and Marcella G. Cornish are husband and wife who reside in Omaha, Nebraska. For the calendar year 1951, *200 they filed a timely joint income tax return with the then collector of internal revenue for the district of Nebraska. Marcella G. Cornish is involved herein solely by virtue of having filed a joint return with her husband, therefore the term "petitioner" will be used hereinafter to designate Joel O'D. Cornish. Petitioner has practiced law since 1929, first in New York where he worked for a large law office for five years and then in Omaha where he had his office in his home. Since about 1953 he has had his office in the First National Bank Building in Omaha. For the most part, petitioner's practice deals with estates, trusts, and guardianships involving members of his own family and relatives, and a very little ordinary work for outsiders. Petitioner's income from dividends, interest, etc., greatly exceeded gains made on the sale of the lots in issue. In petitioner's 1951 income tax return he reported a loss of $3,203.02 from the business of "lawyer & real estate rentals", a profit of $56,581.88 from dividends, $517.23 from interest, and $5,985.71 from long-term capital gains. Petitioner also owns farms and other property in Nebraska. In 1920, the petitioner, along with his sister, *201 Rose Fisher, and his brother, Albert A. Cornish, acquired an undivided onefourth interest in a 20-acre tract of land near the city limits of Omaha (hereinafter referred to as Tract I), under the terms of a testamentary trust. In 1937 the petitioner, his brother and sister each became the owner of a one-third undivided interest in Tract I. Between 1937 and 1950, petitioner, for himself and as managing agent for the other owners, rented the tract to various tenants for farming purposes. Late in 1949, the petitioner was approached by Dr. Pedersen, who wanted to purchase two acres in the southwest corner of Tract I. In the latter part of June 1950, the petitioner and his brother and sister agreed to sell the two acres at $1,000 an acre. Petitioner advised Dr. Pedersen that it would be necessary to determine where a road would be constructed through Tract I before title could be passed. Dr. Pedersen also agreed to pay petitioner a proportionate share of the expense in bringing city water to the property in lieu of drilling a well. Petitioner thereupon went to the Federal Housing Administration in Omaha to get advice as to where a road should be constructed and to acquire subdivision *202 maps and a plat for Tract I. The Federal Housing Administration informed petitioner that it had ceased making plats but would be glad to examine a plat that had been made elsewhere. Petitioner was also informed that John Wear and George Boland, Omaha attorneys who owned a 20-acre tract (adjoining Tract I on the west and hereinafter referred to as Tract II), were in the same position as the petitioner in that they had owned Tract II for a number of years and had decided to sell. John Wear contacted the petitioner and told him that Clarke C. Wilson held an option to purchase at $1,000 an acre a 10-acre tract of land (hereinafter referred to as Tract III) which adjoined Tract II to the west. Wilson also owned 10 acres immediately north of Tract III. John Wear and Wilson had already talked of going together to dispose of their properties. At a meeting early in 1950, John Wear, Boland, Wilson and the petitioner agreed that they would all go together and develop what was to be called Cornish Heights, This development was to include Tracts I, II, and III and originally the 10 acres north of Tract III. The expenses and proceeds were to be apportioned to each tract. At this time, it was *203 petitioner's intention to use this method as the most advantageous way to liquidate his (and his brother's and sister's) interest in Tract I. In 1950, petitioner's sister decided not to participate in the plan of development and petitioner purchased her undivided onethird interest in Tract I at $1,000 per acre. Also in 1950, Wilson decided not to exercise his option in Tract III nor subdivide the 10 acres he owned north of Tract III. Wilson gave his option to petitioner and John Wear who exercised the option and purchased Tract III at $1,000 per acre. Wilson also gave petitioner and Wear a right-of-way across his 10-acre tract for a sewer line. Also in 1950, after a certain amount of talking and spadework, Boland decided he did not care to proceed with the subdivision of his interest in Tract II due to the fact that it would take too much time. Petitioner then purchased Boland's interest in Tract II at $1,000 per acre. To facilitate the granting of deeds, the titles to Tracts II and III were transferred to John Wear and petitioner as "trustees." The nearest water, sewer, and gas lines to Tract I were across Tracts II and III. Petitioner did not attempt to purchase a right-of-way *204 over these tracts. The next closest water connection to Tract I was at least twice the distance as the route across Tracts II and III. Two separate plats were made, one for Tracts II and III and one for Tract I. The plat for Tract I has never been filed with the Register of Deeds. The petitioner and John Wear expended for development, such as rock paving, water, sewer, gas, grading, abstracts, and miscellaneous expenses, the following sums: 1950
$22,042.40
1951
7,135.15
1952
15,303.87
1953
6,891.76
1954
6,256.25
1955
3,969.75
TOTAL
$61,599.18 Of the 1950 expenditures, $10,500 was incurred in grading and installing a water and sewer line for Tract I. The remainder of the expenditures was for improvements to Tracts II and III. One of the reasons Tract I fell behind the other tracts in development was because of certain litigation affecting the right of the petitioner to pass clear title. No lots were sold from Tract I in the years in issue as it was decided to put aside further activity on Tract I until title could be cleared. During 1951 and 1952, Clarke C. Wilson was given the agency to sell certain lots in Tracts II and III. He placed a "For Sale" *205 sign on the premises and advertised the sale of these lots in the newspaper. Wilson sold one of the lots in issue in November 1951, for which he received a regular real estate commission. Robert Wear and Frank Wear are sons of John Wear and do business in a partnership known as, and hereinafter referred to as, Wear Brothers. They are engaged in the real estate and house building business. During 1951 and subsequent years, Wear Brothers were engaged by the petitioner and John Wear as real estate agents to make sales of lots in Cornish Heights. In some instances, the petitioner and John Wear sold lots outright to Wear Brothers for the regular list price, less the regular real estate commission, to be disposed of by Wear Brothers as they saw fit. The other lot in issue was sold in this manner to Wear Brothers in July 1951. Wear Brothers arranged for display advertising in connection with the promotion of sales. The advertisements stated that salesmen were on the grounds of Cornish Heights all day and also listed the phone numbers of Wear Brothers. Wear Brothers also placed a "For Sale" sign on the property. John Wear and petitioner have paid for advertising as follows: 1950
None
1951
None
1952
$443.76
1953
719.21
1954
748.58
1955
None
1956
None
*206 The following is the number of lots sold, the total proceeds and gain from the sale of lots in Cornish Heights as reported by petitioner from January 1, 1951 to December 31, 1955: Year
Lots Sold
Proceeds
Gain
1951
2
$ 6,781.25
$ 4,307.72
1952
4
7,350.00
3,711.89
1953
5
8,662.50
3,516.85
1954
8
9,474.75
3,821.83
1955
16
40,170.00
20,429.83
TOTAL
$72,438.50
$35,788.12
Prior to any of the above sales, the petitioner did not have any contact nor see a single one of the purchasers except for an unsolicited sale to Merritt and Wear Brothers. Petitioners and Wear executed deeds to lots from Tracts II and III both as trustees and individuals. All sales of lots have been from Tracts II and III except for the initial sale in 1950 to Dr. Pedersen. Petitioner, John Wear, and Robert Wear constitute a "Restrictions Committee" for Cornish Heights. One of the committee functions is to examine all plans for the building of houses within the development. In the joint return for 1951, petitioner reported the gain of $4,307.72 from the sale of his interest in two lots as long-term capital gain. Respondent contends that the gain cannot be considered *207 a long-term capital gain but is ordinary income. Petitioner purchased interests in Tracts II and III with the intention of subdividing, improving, and selling the property by lots to customers. The lots sold in 1951 were held by the petitioner primarily for sale to customers in the ordinary course of business. Opinion MULRONEY, Judge: The sole issue in this cast is whether the profit realized by the petitioner from the sale of two lots in Omaha, Nebraska, in 1951 is taxable as ordinary income or as a long-term capital gain. Petitioner contends that the purchase and development of Tracts II and III were necessary parts of his plan to liquidate a capital asset, Tract I. Respondent contends that the lots were held by the petitioner primarily for sale to customers in the ordinary course of his trade or business. The issue is essentially one of fact. . Many tests for the determination of this issue have been adopted by this and other courts. No single test, however, is decisive and the question must be viewed in the light of all pertinent factors and particularly the facts of the individual case. . *208 We said in : "The governing considerations have been the purpose or reason for the taxpayer's acquisition of the property and in disposing of it, the continuity of sales or sales related activity over a period of time; the number, frequency, and substantiality of sales, and the extent to which the owner or his agents engaged in sales activities by developing or improving the property, soliciting customers, and advertising." * * * See also , affd. ; ; and . The test which deserves the greatest weight is the purpose for which the property was held during the period in question. . Petitioner argues the lots sold were not held by him for sale to customers in the ordinary course of business. He points out that his primary business was that of a lawyer and he argues the sales were part of a plan to liquidate a capital asset. In 1951 petitioner had his law office in his home and he stated his clients were mostly members of his *209 family and relatives. He said he earned large fees during some years but his law practice in 1951 could not have been very active. He derived most of his income from rentals and investments. In his 1951 income tax return he lumped his income as "lawyer & real estate rentals" in one schedule and reported total gross receipts from the dual business of $6,652.84. He listed expenses of $9,855.85, showing a loss of $3,203.02 from his business as a lawyer and landlord. The inference is rather plain that, although petitioner states his primary occupation was practicing law, it was not a very active practice. Petitioner argues that he devoted very little time and effort to the development of Cornish Heights. Petitioner stated that Boland withdrew as one of the developers because he said, "it would take too much of his time." Petitioner did employ real estate agents to make sales, and even if he made none of the sales personally, "Engagement in business through an agent is equally as effective as personal participation." . We feel his supervision over the Cornish Heights real estate business was something more than general. While he states he *210 only visited the area twice in the year involved he seems to have done much toward securing simple titles for easy conveyance of the lots, and toward securing rights of way, and the inference is plain that he took quite an active participation in the platting, grading, and improvement of the lots in the area. This was a restricted residential district and the record shows he and John Wear and Robert Wear served on the Restrictions Committee for Cornish Heights. One of the functions of this committee was to examine all of the plans for the construction of houses on Cornish Heights lots and make determinations as to where they should be located on the lots. Petitioner's main argument is that the sales of the lots in 1951 were in furtherance of a plan to liquidate a capital asset. There is much authority holding a taxpayer will not lose the benefits of capital gain treatment when liquidating a capital asset, such as realty, if the liquidation operation is conducted with the usual attributes of a liquidation, and not the attributes of a business. , ; . And a taxpayer *211 may choose the most advantageous method of liquidating the assets. As stated in : "The sale may be conducted in the most advantageous manner to the seller and he will not lose the benefits of the capital gain provision of the statute, unless he enters the real estate business and carries on the sale in the manner in which such a business is ordinarily conducted." * * * In the years prior to 1951 petitioner acquired, through a family trust and an inter-family conveyance, a one-third interest in Tract I and it is abundantly clear the acquisition was not for the purpose of sale in the regular course of petitioner's business. It is also clear that the sale to Dr. Pedersen in 1950 of three acres of this tract was merely the liquidation of a capital asset by the three owners. It is petitioner's argument that shortly after the sale to Dr. Pedersen, he formed the plan of liquidating this capital asset (Tract I) and every act thereafter performed by him, such as platting of Cornish Heights, acquiring another one-third interest in Tract I, and acquiring a one-half interest in adjoining Tracts II and III were, as he states *212 in his brief, "logically required by or for the protection of, the original and primary act of disposing of a capital asset." They may have been required in order to secure the best price for Tract I lots, but those acts, accompanied with extensive development, sales activity, and a continuity of sales transactions show quite conclusively that petitioner had entered the real estate business. We do not think it particularly significant that the 1951 sales were of lots in Tracts II and III, for it is apparent, by 1951, petitioner was holding all of his Cornish Heights lots, including Tract I, for sale in the same manner, to customers in the ordinary course of business. However, petitioner explained the lots in Tract I were not being sold because of title difficulties. But there would be less argument for giving capital gains treatment for sales of lots in Tracts II and III for these tracts were purchased with the definite plan of platting and selling to lot purchasers, or, in other words, customers. The reason petitioner ascribes for purchasing his interest in Tracts II and III, to bring utilities to Tract I so it could be sold to best advantage, is immaterial. The lots in Tracts II *213 and III were at all times after petitioner's purchase, held by petitioner for sale to customers. The reason for which the property is held during the period in question is the most important test ( ), not the reason that prompted the purchase. We hold the respondent was right in holding the profit from the sale of the lots in issue should be taxed as ordinary income. Decision will be entered for the respondent.